# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 12-CR-2024 CJW-MAR |
| vs. | |
| LUSTA JOHNSON, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 30, 2020. (Doc. 834). On July 2, 2020, the government timely filed a brief in resistance. (Doc. 835). On July 7, 2020, defendant timely filed a reply. (Doc. 836). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

In 2008, defendant met D.A., who recruited defendant to sell heroin in Waterloo, Iowa. (Doc. 648, at 5). D.A. supplied defendant with heroin and defendant repackaged and sold the heroin. (*Id.*). Defendant was paid in cash, heroin, or both. (*Id.*). When D.A. left Waterloo in May 2010, defendant briefly switched to a different supplier of heroin before developing his own heroin connection in Chicago, Illinois. (*Id.*). Defendant regularly travelled to Chicago to acquire heroin and cut, package, and resell it in Waterloo. (*Id.*). Defendant sold heroin to numerous people. (*Id.*, at 5–7). Defendant himself purchased and used heroin daily. (*Id.*). Defendant continued to acquire and sell heroin until he left Waterloo in August 2012. (*Id.*, at 5).

On August 22, 2012, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute heroin in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846, and 851 ("Count 1") and one count of distributing heroin in violation of Sections 841(a)(1), 841(b)(1)(C), and 851 ("Count 2").[1] (Doc. 15). That same day, the Court issued a warrant for defendant's arrest. (Doc. 16). On October 16, 2013, more than a year later, officers arrested defendant. (Doc. 554). On November 13, 2013, defendant pleaded not guilty and was detained. (Doc. 579). On April 8, 2014, defendant changed his plea to guilty on Count 1 of the Indictment pursuant to a plea agreement with the government. (Docs. 632 & 635). On April 9, 2014, the Court accepted defendant's plea. (Doc. 638).

On May 20, 2014, the United States Probation Office ("USPO") filed defendant's final presentence investigation report. (Doc. 648). Defendant was, at that time, 58 years old and residing in Illinois. (*Id.*, at 3). His parents were married until his father's death. (*Id.*). Defendant reported having a good relationship with both his parents, that both his parents were active and present in his life, and that his needs were met as a child. (*Id.*). As an adult, defendant distanced himself from his parents to conceal his drug abuse. (*Id.*). Both defendant's parents and all four of his brothers had passed away. (*Id.*). One of his sisters was a childcare provider and the other was incarcerated as a co-defendant in this case. (*Id.*). All his siblings except one of his sisters abused alcohol, cocaine, and heroin, with some having criminal histories. (*Id.*, at 21). Defendant had one child from a previous relationship and two children and three stepchildren through his marriage. (*Id.*). One of defendant's stepsons was a co-defendant in this case and the other was incarcerated for robbery. (*Id.*). Defendant's son was incarcerated on drugs and weapons charges in Indiana. (*Id.*). Defendant also noted his wife was involved in drug-related

---

[1] Defendant had 13 co-defendants facing a variety of criminal charges. (Doc. 15).

criminal conduct. (*Id.*). Defendant dropped out of high school but later earned his GED, earned a culinary certificate while incarcerated, and was briefly enrolled at a community college. (*Id.*, at 25). Defendant held stable employment at a meat packaging facility. (*Id.*, at 26).

Defendant's criminal history was extensive. His convictions consisted of the following: conspiracy to commit armed robbery at age 18; theft via "a purse snatch" at 21; criminal damage to property at 22; theft at 24; theft at 25; possession of a hypodermic needle at 30; possession with intent to deliver cocaine at 41; possession with intent to deliver heroin also at 41, only a month after his most recent conviction; possession with intent to deliver heroin again also at 41, less than a month after his most recent conviction; delivery of heroin near an elementary school at 42; driving on a suspended license three times from ages 51 to 53; theft at 54; and driving while barred twice from ages 54 to 55. (*Id.*, at 10–14). Throughout this time, defendant failed to appear for court, had his probation or parole revoked multiple times, and was frequently arrested or charged under a false name. (*Id.*). It appears the longest term of incarceration he served prior to the instant offense was approximately three and a half years. (*Id.*). He also had more than a dozen arrests, some of which were drug-related or violent. (*Id.*, at 15–19).

Defendant had been treated for back and leg pain, some of which he attributed to work-related injuries. (*Id.*, at 22–23). He reported no mental health concerns. (*Id.*, at 23). Defendant reported long and frequent abuse of alcohol, marijuana, and heroin, sometimes using daily. (*Id.*, at 23–24). He also used cocaine daily in the past. (*Id.*, at 24). When he could not acquire heroin, he often used pain medications as a substitute. (*Id.*). Defendant had completed substance abuse treatment three times and intermittently attended Alcoholics Anonymous and Narcotics Anonymous. (*Id.*).

On June 3, 2014, the Court sentenced defendant. (Doc. 654). Defendant was in criminal history category VI, after receiving a career offender enhancement, and had a

3

total offense level of 31, yielding an advisory guideline range of imprisonment of 188 to 235 months followed by four years to life on supervised release. (Doc. 648, at 15, 28). Defendant moved for a downward variance based on his addiction, age, and the remoteness of his criminal history. (Doc. 650-1). The Court denied his motion and sentenced him to 188 months' imprisonment followed by four years on supervised release. (Doc. 656). On June 17, 2014, defendant timely appealed his sentence. (Doc. 661). On October 15, 2014, the Eighth Circuit Court of Appeals granted defendant's voluntary dismissal of his appeal. (Doc. 679). On June 26, 2015, the Court, on its own motion, found defendant was not eligible for a sentencing reduction in light of changes to the United States Sentencing Guidelines ("USSG"). (Doc. 708). Defendant is now incarcerated at FCI Terre Haute with a projected release date of February 22, 2027. (Doc. 834-1, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that

4

the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist

5

to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On May 6, 2020, defendant submitted his request for release to FCI Terre Haute's warden. (Doc. 834–4). On May 7, 2020, the warden acknowledged defendant's request but has not since acted on it. (Doc. 834–1, at 2). On June 30, 2020, defendant filed his motion for release now before the Court. (Doc. 834). Because 30 days elapsed since defendant submitted his request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

#### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 834–1, at 5–10). Specifically, defendant cites his age of 65, hypertension,[2] and hepatitis C. (*Id.*, at 6–7).

---

[2] Hypertension refers to high blood pressure. Blood pressure of less than 120/80 mm Hg is considered within normal range. *Understanding Blood Pressure Readings*, American Heart Association, https://www.-heart.org/en/health-topics/high-blood-pressure/understanding-blood-

6

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id*.

Defendant fits the CDC's risk category for persons over 65, albeit marginally. He turned 65 less than three weeks ago. (Doc. 648, at 3). The record does not discuss any age-related deterioration or difficulties defendant suffers.

Defendant has a history of hypertension. (Docs. 834–2, at 4, 11; 834–3, at 8, 14, 61). Throughout May and June 2020, defendant's blood pressure tested at 160/90, 158/94, 130/84, 144/87, and 130/88. (Doc. 834–2, at 6). Throughout 2019, his blood pressure tested at 123/83, 138/76, 116/74, 126/88, 148/86, 154/96, 155/88, 168/94, and 163/97. (Doc. 834–3, at 4, 11, 14, 19, 30, 32, 38, 42, 47, 51–52). Thus, he is

---

pressure-readings. Elevated blood pressure is when readings consistently show 120–129 systolic and less than 80 mm Hg diastolic. *Id*. Hypertension Stage 1 is when readings consistently show 130–139 systolic or 80–89 mm Hg diastolic. *Id*. Hypertension Stage 2 is when readings consistently show 140/99 mm Hg or higher. *Id*. Hypertensive crisis, which requires immediate medical attention, is when readings suddenly exceed 180/120 mm Hg. *Id*.

consistently in stages 1 or 2 of hypertension. His hypertension is medicated and well-monitored. *See, e.g.*, (Docs. 834–2, at 4; 834–3, at 21). In February 2019, a report noted defendant had some fluid around his heart and that his heart was "slightly thickened" due to high blood pressure. (Doc. 834–2, at 42). The record does not otherwise discuss his hypertension with significant alarm or indicate any complications resulting from this condition. Notably, his condition is essential hypertension, "by far the most common form," meaning it "has no clearly identifiable cause" and is instead "linked to genetics, poor diet, lack of exercise and obesity." *Essential Hypertension*, Ada Health, https://ada.com/conditions/essential-hypertension/ (Jan. 27, 2020). The CDC considers pulmonary hypertension as a serious heart condition and holds that other forms of hypertension "may" increase a person's susceptibility to COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F-%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2F-groups-at-higher-risk.html#serious-heart-conditions. Courts are mixed on the extent to which essential hypertension constitutes a serious heart condition which elevates a person's risk of serious complications from COVID-19. *Compare*, *United States v. Salvagno*, 5:02-CR-51 (LEK), 2020 U.S. Dist. LEXIS 109879, at *26 (N.D.N.Y. June 22, 2020) (finding the CDC's list to be non-exclusive and non-determinative in light of serious complications that can result from essential hypertension), *with*, *United States v. Batista*, No. 19 Cr. 2 (JFK), 2020 WL 3249233, at *3 (S.D.N.Y. June 16, 2020) (noting the defendant's history of essential hypertension was not a serious heart condition amid the pandemic). Given defendant's consistent

hypertension and the known risks that accompany it,[3] the Court will consider defendant's essential hypertension as a serious heart condition, but also notes it is not the type of serious heart condition known to inherently raises his susceptibility to COVID-19.

Defendant also asserts his hepatitis C puts him in the risk categories for persons with a liver disease and immunocompromised persons. His condition is described as chronic and without hepatic coma. (Doc. 834–2, at 11). His most recent assessment in July 2019 found he had a high viral load of 7,100,000 IU/mL compared to a reference range of non-detectable. (Doc. 834–3, at 77).[4] This is a marked increase over his viral load of 6,176,000 IU/mL in October 2017. (*Id.*, at 30). It appears defendant has only recently been recommended for treatment, so it is unknown how his viral load might respond. *See, e.g.*, (*Id.*, at 21, 30). The record does not otherwise discuss his hepatitis C with significant alarm or indicate any complications resulting from this condition. There is no indication it significantly affects his immune system at this time or that defendant is otherwise immunocompromised. Thus, defendant at least fits the CDC's category for a person with a chronic liver disease.

In considering defendant's conditions, the Court must also evaluate to what extent he is at risk of exposure to COVID-19 at FCI Terre Haute. The facility has one active case of COVID-19 among its inmate population. *COVID-19*, BOP, https://www.-bop.gov/coronavirus/. One staff person has recovered. *Id.* Although defendant's risk

---

[3] The Court gives greater weight to these potential risks given that defendant's father and three of his siblings, one brother and two half-brothers, died of heart attacks at relatively young ages. (Doc. 648, at 20).

[4] This report indicates defendant's viral load was 7,100,000 IU/mL within a reportable range of 15 IU/mL to 100,000,000 IU/mL. (Doc. 834–3, at 77). Generally, more than 800,000 IU/mL is considered a high viral load. *Hepatitis C Viral Load / HCV RNA Quantitative Testing*, U.S. Dep't of Veteran Affairs, https://www.hepatitis.va.-gov/hcv/patient/diagnosis/labtests-RNA-quantitative-testing.asp#:~:text=The%20-viral%20load%20of%20hepatitis,hepatitis%20C%20%22viral%20load.%22.

9

at FCI Terre Haute is low at the moment, further spread of the virus could occur rapidly. As discussed, defendant meets three of the CDC's risk categories due to his age, hypertension, and hepatitis C. Although his health conditions do not appear to have a significant impact on him at this time, they are serious conditions which likely raise his susceptibility to COVID-19. *See United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020) (holding the defendant's age, essential hypertension, type 2 diabetes, asthma, and other conditions warranted release); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *1 (E.D. Mich. May 11, 2020 (holding the defendant's age, diabetes, hypertension, and chronic pain warranted release).

Thus, the Court finds defendant has presented an extraordinary and compelling reason for release in light of his age, hypertension, and hepatitis C. This reason, though, is only marginal given that defendant currently shows no signs of deterioration or instability resulting from such conditions and his current risk of exposure is low. The Court must also, however, evaluate whether release is appropriate under the Section 3553(a) factors.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need

10

Case 6:12-cr-02024-CJW-MAR   Document 837   Filed 07/10/20   Page 10 of 12

to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The circumstances of defendant's offense are mixed. He was recruited into selling heroin in part to support his addiction. When his recruiter left, however, he continued to distribute heroin for two more years. He developed his own supply of heroin, travelled regularly to pick it up, and funneled it into the Waterloo community. During this time, he was still himself a severe heroin addict. His upbringing does not explain his criminal activity as an adult, although it is noted most of his siblings also struggled with substance abuse. It is mitigating that defendant held stable employment and completed drug treatment at least three times. He was unsuccessful, however, in controlling his addiction. Indeed, defendant earned his career offender enhancement. Despite multiple convictions for dealing controlled substances, defendant repeatedly returned to the exact same conduct, sometimes almost immediately. The Court does not find it mitigating that defendant's recent convictions prior to the instant offense were relatively minor. (Doc. 834–1, at 12). The instant offense spanned four years and is part of a pattern that relates to defendant's older criminal conduct. He has also not performed well under supervision.

Defendant argues release is appropriate because the instant offense stems from his addiction issues which began when he was a teenager. (Doc. 834–1). Although the Court is sympathetic to the struggles of addiction, defendant cannot write off years of heroin distribution as a middle-aged adult on his troubles as a teen. Defendant was in his mid to late 50's when he engaged in this conduct. He had already been convicted of multiple drug offenses. He already understood he had an addiction problem and was afforded treatment on multiple occasions. Instead of reaching out to his family for help, he hid his drug problem and even joined with some family members in the underlying offense here. Despite knowing the legal risks, he chose not only to use heroin but to

11

distribute it. The bottom of the guideline sentence defendant received accurately accounted for his somewhat mitigating history in light of his status as a career offender.

Defendant has a promising release plan. (Doc. 834–6 & 834–7). He has also performed well in prison, notably by working, taking a significant number of educational courses, completing drug treatment, and attending faith-based activities. (Doc. 834–5). He also has had no disciplinary incidents. (*Id.*, at 1). These mitigating improvements, however, do not warrant a further six-and-a-half-year reduction in his sentence beyond the good time credit he has already received. The Court finds that such a reduction, given the aggravating circumstances here, would be inappropriate and contrary to the goals of 3553(a) given defendant's only marginally elevated risk amid the pandemic.

On balance, the circumstances here weigh in favor of maintaining defendant's sentence in order to fulfill the goals of Section 3553(a).

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 834). Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 656).

**IT IS SO ORDERED** this 10th day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa